**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

REYNALDO DEGUZMAN,

                        Plaintiff,

        -against-

UNIVERSITY OF ROCHESTER; BOARD OF
TRUSTEES OF THE UNIVERSITY OF
ROCHESTER; GERALD PICKERING (former
Deputy Director of the University of
Rochester's Department of Public Safety), in his
individual capacity; and JOHN DOE OFFICERS 1-6
(University of Rochester Department of Public
Safety Officers), in their individual capacities,

                      Defendants.

------------------------------------------------------------------ X

No. 24-cv-6729

**COMPLAINT**

<u>Jury Trial Demanded</u>

Plaintiff Reynaldo DeGuzman, by and through his attorneys, The Law Office of Joshua

Moskovitz, P.C., and Easton Thompson Kasperek Shiffrin LLP, alleges as follows:

## PRELIMINARY STATEMENT

1.       This lawsuit addresses abuses of the University of Rochester's police powers.

The State of New York has delegated police powers to University Public Safety Officers by

expressly authorizing them to conduct arrests on property "owned, controlled or administered by

the University of Rochester" *and* "any public street and sidewalk that abuts the grounds, buildings

or property of such university."[1] Relying on these state-delegated powers, the University has

"banned" people like Reynaldo DeGuzman, who has reported on the University police

department's response to student protests, and has threatened to arrest Mr. DeGuzman in an effort

to prevent negative publicity about the University police's anti-protest operations.

---

[1] *See* New York Criminal Procedure Law § 2.10(84)(b).

2.      Mr. DeGuzman is a journalist and filmmaker whose reporting and documentary work focuses on police accountability, racial injustice, and grass-roots activism. He is a lifelong Rochester resident and has frequently collaborated with students and faculty at the University of Rochester to showcase his work, including at the University's Memorial Art Gallery and in workshops organized by professors and students.

3.      In the Fall of 2023, as student groups were protesting the treatment of Palestinians in the Gaza Strip and urging the University of Rochester to divest from Israel, the University's response to those protests drew public criticism and Mr. DeGuzman—who National Public Radio has called a "protest chronicler"—got his camera out. For a little over two months, Mr. DeGuzman reported on the student-led protests and University police department's response before University Public Safety Officers began to harass Mr. DeGuzman. In December 2023, Mr. DeGuzman was walking on a public sidewalk near his home, which happens to be adjacent to University property when six University Public Safety Officers surrounded Mr. DeGuzman and threatened to handcuff him—which they had no legal basis to do. One of the officers referred to Mr. DeGuzman by his professional name, "Martin Hawk," revealing that the officers had targeted Mr. DeGuzman because of his journalistic activity. While the officers eventually let Mr. DeGuzman go, the encounter was deeply disturbing and made Mr. DeGuzman feel afraid to be in public spaces in his own neighborhood.

4.      Despite his reasonable fear of further harassment or even arrest by University officers, Mr. DeGuzman continued to chronicle the University's crackdown on the campus protests. In May 2024, Mr. DeGuzman covered a press conference about the campus protests that was held off University property and the public march that followed, which took place on and off University property. As Mr. DeGuzman filmed the march and the University's policing of the

protest, the Deputy Director in charge the University's police department, Gerald Pickering, confronted Mr. DeGuzman. Mr. Pickering told Mr. DeGuzman that he was "banned" from University property and threatened Mr. DeGuzman with arrest if he came onto University property. Mr. Pickering's threat prevented Mr. DeGuzman from continuing to film the University police's response to the protest and has prevented Mr. DeGuzman from reporting on other student protests and the University's response to those protests.

5.     The "ban" on Mr. DeGuzman has severely limited his freedom of movement throughout the City of Rochester. The University is a massive landowner in the City of Rochester. It owns and/or controls property across the City, including openly accessible parks and other public spaces, hospitals and medical offices, business and shopping centers, and restaurants and other businesses. The University operates its own publicly accessible transportation system consisting of several bus lines. It is nearly impossible to live, work, or travel in Rochester without going onto University property or areas that abut University property.

6.     The University's unjustified ban on Mr. DeGuzman—which is part of its custom and practice of banning people whose political expression the University disfavors—has had an enormous impact on Mr. DeGuzman's daily life. Mr. DeGuzman has been forced to put his collaborations with the University's Black Studies, Anthropology, and Religion Departments on hold out of fear that he will be arrested if he comes to meetings on campus. Mr. DeGuzman has been forced to avoid parks, shops, restaurants, and even doctors' offices that he believes are owned or controlled by the University, out of fear that he will be arrested if he enters those properties. Given the extent of the University's landholdings across the City—including in Mr. DeGuzman's own neighborhood—Mr. DeGuzman lives in constant fear when he leaves his house that he may be harassed or arrested by University Public Safety Officers.

3

7.     Mr. DeGuzman brings this action to compel the University of Rochester to rescind its unlawful ban and enjoin its unlawful threat of arrest that has prevented him from living his normal life and engaging in constitutionally protected free speech, including filming University law enforcement activity. Mr. DeGuzman seeks redress through this lawsuit for the violations of his civil and constitutional rights, guaranteed and protected by state and federal laws.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

9.     This Court also has supplemental jurisdiction 28 U.S.C. § 1367(a) over Plaintiff's state law claims because they are so related to the federal claims within the original jurisdiction of this Court as to form part of the same case or controversy.

10.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

11.     Venue is properly laid in the Western District of New York because the acts and omissions described herein occurred in the jurisdiction of the Western District of New York.

## JURY DEMAND

12.     Plaintiff demands a trial by jury in this action on each and every claim for which a jury trial is legally available.

## PARTIES

13.      Plaintiff REYNALDO DEGUZMAN is a resident of Rochester and lives a two-minute walk from the University of Rochester's River Campus.

14.     Mr. DeGuzman is a video journalist, and he uses the pen name, "Martin Hawk."

15.     Defendant UNIVERSITY OF ROCHESTER ("the University") is a private non-profit organization with its principal place of business in Rochester. The University maintains a Department of Public Safety ("DPS") comprised of Peace Officers and Public Safety Officers. The DPS acts as the University's agent and the University assumes the risks incidental to the maintenance of DPS and the employment of Peace and Public Safety Officers. DPS is responsible for policing the University's campus and surrounding neighborhoods.

16.     Defendant BOARD OF TRUSTEES OF THE UNIVERSITY OF ROCHESTER owns and operates the University of Rochester.

17.     Defendant GERALD PICKERING was, at all times relevant to this action, employed by the University as the deputy director of DPS.

18.     Defendants JOHN DOE OFFICERS 1-6 were, at all times relevant to this action, employed by the University as Peace Officers and/or Public Safety Officers.

19.     Defendant JOHN DOE OFFICER 1 is pictured in Figure 1 below.



*Fig. 1*

20.     Defendant JOHN DOE OFFICER 2 is pictured in Figure 2 below.



*Fig. 2*

21.     Defendant JOHN DOE OFFICER 3 is pictured in Figure 3 below.



*Fig. 3*

22.     Defendant JOHN DOE OFFICER 4 is pictured in Figure 4 below.



*Fig. 4*

23.    Defendant JOHN DOE OFFICER 5 is pictured in Figure 5 below.



*Fig. 5*

24.    Defendant JOHN DOE OFFICER 6 is pictured in Figure 6 below.



*Fig. 6*

25.    At all times relevant to this action, Defendants PICKERING and JOHN DOE OFFICERS 1-6 acted under color of law and within the course and scope of their duties and authority as officers, agents, servants, and employees of DPS and the University. They are sued in their individual capacities.

26.    Defendant University of Rochester is liable for the conduct of Defendants PICKERING and JOHN DOE OFFICERS 1-6 under the doctrine of *respondeat superior*.

## FACTS

### I.    Plaintiff Reynaldo DeGuzman

27.    Mr. DeGuzman is a journalist and filmmaker.

28.    Mr. DeDuzman films and footage have been installed and exhibited by the Rochester Contemporary Art Gallery, the UUU Art Gallery, the Portland Film Festival, New York University, the University of Iowa, SUNY Brockport, and the Little Theatre, among other institutions.

29.    Mr. DeGuzman is also active in his local community, and often works with Rochester-based volunteer organizations and non-profits, including the Rochester Tenant Union, Citizen Action Rochester, Decarcerate Rochester, Free the People Rochester, Rochester Committee Against Apartheid, Rochester Food Not Bombs, 490 Farmers, The People's Slate, and the New York Recovery Alliance.

30.    Mr. DeGuzman also works with "Our Local History," through which his reporting and documentary work routinely features in the curriculum of public schools throughout New York.

31.    Mr. DeGuzman lives in the City of Rochester in a neighborhood that is adjacent to a University of Rochester campus.

### II.    The University of Rochester

32.    The University of Rochester maintains several campuses throughout the City of Rochester.

33.    The University's campuses cover more than 700 acres in the City of Rochester.

34.    The University also owns and leases property throughout the City of Rochester outside of its campuses.

35.     The University does not post signs indicating that members of the public may not access its property; to the contrary, the University's website announces that "University buildings and outdoor spaces are open to visitors attending a University program or event, so long as they obey University rules and instructions."

36.     The University hosts numerous large-scale events on its property that are open to the public, including the Rochester International Jazz Festival and the Rochester Fringe Festival.

37.     The University maintains numerous facilities that are open to the public, including the Memorial Art Gallery, the Sage Art Center, and the Eastman School of Music.

38.     The University leases property to private businesses that serve the public throughout the City of Rochester.

39.     There is no reasonable way for a person to know every space in the City of Rochester that is owned or controlled by the University.

40.     The University's website declares that the University is "[s]teeped in Rochester's rich history of social justice and entrepreneurial spirit" and "will always be an inclusive, equitable, sustainable, and responsive organization at every level."[2]

41.     The University's website also proclaims that it "endorses free speech and peaceful protest," and "does not restrict speech based on viewpoint or content."[3]

## III.    The University's Department of Public Safety

42.     The University operates a law enforcement agency known as the Department of Public Safety ("DPS").

---

[2] *See* Univ. of Rochester, *Vision & Values*, https://www.rochester.edu/about/values.html.
[3] *See* Univ. of Rochester, *Guidelines for Free Speech and Peaceful Protests,* https://www.rochester.edu/public-safety/about/staff-directory/.

43.     DPS is comprised of nearly 200 staff members, including active patrolmen and women called Public Safety Officers.[4]

44.     New York State law empowers the University of Rochester Board of Trustees to designate as many Public Safety Officers "as peace officers as is determined by the board of trustees to be necessary for the maintenance of public order."[5]

45.     According to the University, its Peace Officers, some of whom are armed, have "the sworn authority to make arrests within University properties and areas that are immediately adjacent to University boundaries."[6]

46.     This is consistent with New York State law, which empowers peace officers to "make warrantless arrests," "use physical force and deadly physical force in making an arrest," and "carry out warrantless searches."[7]

47.     New York law also empowers a designated peace officer, "whether or not he is acting pursuant to his special duties," to "arrest a person for an offense committed or believed by him to have been committed within the geographical area of such peace officer's employment."[8]

48.     New York law further empowers peace officers to conduct a felony arrest "anywhere in the state" when the officer "has reasonable cause to believe that such person has there committed such felony in his presence."[9]

---

[4] *See* Univ. of Rochester, *Department of Public Safety: Staff Directory*, https://www.rochester.edu/public-safety/about/staff-directory/.
[5] N.Y. Criminal Procedure Law § 2.10(84)(a).
[6] *See* Univ. of Rochester, *Department of Public Safety: Peace Officers*, https://www.rochester.edu/public-safety/about/peace-officers/.
[7] N.Y. Criminal Procedure Law § 2.20(1)(a)-(c).
[8] N.Y. Criminal Procedure Law § 140.25(3).
[9] N.Y. Criminal Procedure Law § 140.25(4).

49.     New York State law delegates these police powers to the University of Rochester for "the prevention of crime and the enforcement of law and order."[10]

50.     New York State law requires University Peace Officers to coordinate with local law enforcement and "comply with such requirements as shall be mutually agreed upon between the chief law enforcement officers of the applicable local law enforcement jurisdictions and the University of Rochester."[11]

51.     New York law defines the jurisdiction of University Peace Officers to include not only "the grounds or premises owned, controlled or administered by the University of Rochester," but also, "any public street and sidewalk that abuts the grounds, buildings or property of such university, and beyond such geographic area upon the request of the chief law enforcement officer of the local law enforcement jurisdiction or his or her designee."[12]

52.     New York law extends the geographic jurisdiction of University Peace Officers "to include within one hundred yards of University property."[13]

## IV.    Plaintiff's Filming of Student Protests and the University's Response to Those Protests

53.     In the Fall of 2023, student groups at the University began protesting the treatment of Palestinians in the Gaza Strip.

54.     The University's response drew criticism from free speech organizations.

55.     The student protests continued through the Spring of 2024, as student groups set up what the University called "encampments" on campus.

56.     Mr. DeGuzman covered and filmed many of these protests.

---

[10] N.Y. Criminal Procedure Law § 2.10(84)(b).
[11] N.Y. Criminal Procedure Law § 2.10(84)(b).
[12] N.Y. Criminal Procedure Law § 2.10(84)(b).
[13] *See* N.Y. Bill Jacket, 2017 S.B. 6042, Ch. 494.

57.     In late April, 2024, the University began banning students involved in the protests from campus.[14]

58.     On May 9, 2024, Sarah Mangelsdorf, the University's president, issued an announcement that the University would suspend student protestors who refused to decamp.[15]

59.     This announcement led to additional protests and response from the University DPS, which Mr. DeGuzman also covered.

## V.    December 17, 2023: University Public Safety Officers Unlawfully Detain Plaintiff on Public Property

60.     On December 17, 2023, Mr. DeGuzman was walking home from a local pharmacy on the sidewalk along Norfolk Street, a public sidewalk.

61.     John Doe Officer 1 drove by Mr. DeGuzman, but made a U-turn and stopped his vehicle near Mr. DeGuzman.

62.     John Doe Officer 1 got out of his vehicle and approached Mr. DeGuzman saying to him: "There's a domestic between you and your girl."

63.     Mr. DeGuzman told John Doe Officer 1 he was mistaken and walked away.

64.     John Doe Officer 1 followed Mr. DeGuzman down Norfolk Street.

65.     At the corner of Norfolk Street and Crittenden Boulevard, John Doe Officers 2-6 arrived in four DPS vehicles.

66.     The John Doe Officers were all wearing law enforcement uniforms and carrying firearms and other law enforcement tools on their waistbands.

---

[14] *See* Campus Times, *5 students banned from campus for Gaza solidarity encampment* (Apr. 30, 2024), publicly available at: https://www.campustimes.org/2024/04/30/5-students-banned-from-campus-for-gaza-solidarity-encampment/.

[15] *See* Univ. of Rochester, *Message from President Mangelsdorf Regarding Encampment* (May 9, 2024), *available at* https://www.rochester.edu/president/message-from-president-mangelsdorf-regarding-encampment/.

67. John Doe Officers 1-6 surrounded Mr. DeGuzman and refused to let him leave.

68. John Doe Officer 3 took Mr. DeGuzman's ID and did not give it back until they eventually decided to let Mr. DeGuzman go.

69. Throughout the encounter, some of the officers placed their hands on their firearms.

70. Mr. DeGuzman asked what gave the officers the authority to stop a public citizen on a public street, John Doe Officer 2 responded, "We're sworn law enforcement" and John Doe Officer 3 said "New York state gives us that authority."

71. During the encounter, the officers radioed the Rochester Police Department ("RPD") for back up.

72. During the interaction, John Doe Officer 5 told Mr. DeGuzman, "You'll be in jail soon anyway" and John Doe Officer 2 called Mr. DeGuzman "Hawk," a reference to the name "Martin Hawk," which Mr. DeGuzman uses professionally as a video journalist.

73. John Doe Officer 1 claimed Mr. DeGuzman was being detained because he "fit the description" of a suspect, but the officers refused to provide the alleged description or how Mr. DeGuzman matched that description.

74. John Doe Officer 1 conceded that he stopped Mr. DeGuzman and detained him because he "refused to stop" for "a simple conversation."

75. John Doe Officer 1 also claimed that the alleged suspect was in a vehicle but when Mr. DeGuzman said that he had been stopped while walking down the street, John Doe Officer 2 abruptly claimed the suspect "was on foot."

76. John Doe Officer 2 told Mr. DeGuzman that the officer could "put you in cuffs until we prove" that Mr. DeGuzman was not the person they were allegedly looking for.

77.     Mr. DeGuzman requested the names and badge numbers of the officers but they refused to provide identifying information.

78.     After Mr. DeGuzman was detained for approximately ten minutes, the John Doe Officers let him go.

79.     RPD officers arrived shortly after the DPS officers released Mr. DeGuzman, but the RPD officers did not detain Mr. DeGuzman.

## VI.    May 9, 2024: The University DPS Deputy Director Threatens to Arrest Plaintiff and Bans Him from University Property

80.     On May 9, 2024, the University banned one of the leaders of the student protests from being on University campus.

81.     The same day, student groups from the University held a press conference at Genesee Valley Park, which Mr. DeGuzman and other journalists attended.

82.     When the press conference concluded, student protestors began marching toward the University's Wallace Hall and Mr. DeGuzman began filming.

83.     As Mr. DeGuzman filmed the march from a public sidewalk, Defendant Pickering, who was the Deputy Director in charge of the University's Department of Public Safety, approached Mr. DeGuzman and aggressively confronted him.

84.     Mr. DeGuzman was filming Defendant Pickering when he confronted Mr. DeGuzman.

85.     Defendant Pickering told Mr. DeGuzman "You cannot go on university property, you are banned," and told him that he would be arrested if he did not comply with this order.

86.     Defendant Pickering refused to explain why he issued this order to Mr. DeGuzman.

**VII.    The University's Policy, Practice and Custom of Banning and Threatening to Arrest People Based on Their Political Expression**

87.    The University has a policy, custom, and/or practice of "banning" people from University-controlled property under certain circumstances.

88.    As part of this policy, custom, and/or practice, the University informs the subject of the ban that they are "ban[ned] from all properties owned, leased, operated or controlled by the University of Rochester."

89.    As part of its policy, custom, and/or practice, the University does not identify for the person being banned what encompasses all of the properties that are owned, leased, operated or controlled by the University of Rochester.

90.    As part of its policy, custom, and/or practice, the University informs the person who has been banned: "Should you be found on University property at any time in violation of these restrictions, or should it come to our attention that you have been on our property according to a reliable witness, you may be arrested and prosecuted on charges of criminal trespass."[16]

91.    Consistent with and pursuant to its policy, custom, and/or practice, the University has banned people because they have engaged in political speech that the University disfavors.

92.    Consistent with and pursuant to its policy, custom, and/or practice, the University has banned person, like Mr. DeGuzman, because they have reported on the University's response to campus protests and other political dissent.

93.    The DPS Deputy Director is a final policy maker for the University of Rochester for DPS and other law enforcement activity.

---

[16] Were a University Peace Officer to arrest a person because "according to a reliable witness" the person had been in a publicly-accessible open space owned by the University, the arrest would be unlawful. *See*

94.     The DPS Deputy Director's decision to impose a ban on a person represents the policy, custom, and/or practice of the University of Rochester.

## VIII.   The University's Unlawful Ban Has Upended Plaintiff's Life

95.     The University's unlawful ban has had a marked impact on Mr. DeGuzman's professional and personal life.

96.     Mr. DeGuzman lives a two-minute walk from the University's 154-acre River Campus.

97.     The University's campus encompasses private shops and restaurants that Mr. DeGuzman frequently visited before the ban, and he can no longer do so.

98.     The University's campus also encompasses Mr. DeGuzman's doctor's office and pharmacy, which he can no longer access.

99.     Mr. DeGuzman also cannot visit any of the University's public-facing facilities, including the Memorial Art Gallery and the Eastman School of Music, which hosts the Rochester International Jazz Festival and Rochester Philharmonic Orchestra. Mr. DeGuzman was previously a "featured artist" at the Memorial Art Gallery, and he has historically visited the gallery multiple times a week.

100.     Mr. DeGuzman has often collaborated with professors in the University's Black Studies, Religion, and Anthropology Departments to host screenings and workshops with their classes over the past couple years, as well as with the University's "REJI" (Rochester Education Justice Initiative) program. These continued collaborations have been made impossible by the ban.

16

101.    Mr. DeGuzman had also planned to co-host a workshop around his film "Pressure Gradient" with a professor in the Black Studies Department this year. That collaboration has been made impossible by the ban.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**For Interference with Free Speech in Violation of the First Amendment to**
**the United States Constitution Pursuant to 42 U.S.C. § 1983**

102.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

103.    In filming and reporting on student protests and the University's response to those protests, Plaintiff engaged in free speech activity protected by the First Amendment to the United States Constitution.

104.    Defendants intentionally interfered with Plaintiff's free speech activity through conduct that would chill a person of ordinary firmness from continuing to engage in free speech activity.

105.    As a direct and proximate result of Defendants' actions, Plaintiff suffered injuries and damages, including the deprivation of his constitutionally protected right to free speech.

106.    As a direct and proximate result of the ongoing threat to arrest Plaintiff if he engages in protected First Amendment activity, Plaintiff's injuries and damages, including the violation of his constitutionally protected right to free speech, are ongoing and continuing.

### SECOND CAUSE OF ACTION
**Against Defendants John Doe Officers 1-6**
**For Unlawful Seizure in Violation of the Fourth Amendment to**
**the United States Constitution Pursuant to 42 U.S.C. § 1983**

107.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

108.    Defendants University of Rochester and John Doe Officers 1-6 seized and detained Plaintiff without lawful justification in violation of the Fourteenth Amendment.

109.    As a direct and proximate result of the foregoing actions, Plaintiff suffered injuries and damages, including the deprivation of his constitutional rights.

### THIRD CAUSE OF ACTION
**Against Defendants University of Rochester and Defendant Pickering**
**For Interference with Right to Travel in Violation of**
**the Fourteenth Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983**

110.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

111.    Defendants University of Rochester and Pickering interfered with Plaintiff's constitutionally protected right to travel in violation of the Fourteenth Amendment.

112.    As a direct and proximate result of the foregoing actions, Plaintiff suffered injuries and damages, including the deprivation of his constitutional rights.

113.    As a direct and proximate result of the ongoing threat to arrest Plaintiff if he travels freely in publicly accessible areas and buildings throughout the City of Rochester, Plaintiff's injuries and damages, including the violation of his constitutionally protected right to travel, are ongoing and continuing.

### FOURTH CAUSE OF ACTION
**Against Defendants University of Rochester and Defendant Pickering**
**For Unlawful Interference with Recording a Law Enforcement Activity**
**in Violation of New York Civil Rights Law § 79-p**

114.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

115.    In filming and reporting on student protests, and in critiquing DPS officers, Plaintiff engaged in a constitutionally protected activity, this protected activity was a substantial

or motivating factor in Defendants' conduct, and Defendants' conduct would chill a person of ordinary firmness from continuing to engage in said conduct.

116.    As a direct and proximate result of the foregoing actions, Plaintiff suffered injuries and continues to suffer from the threat of future unlawful interference with recording a law enforcement activity.

**FIFTH CAUSE OF ACTION**
**Against All Defendants**
**For Interference with Right to Free Speech in Violation of**
**Article I, Section 8 of the New York State Constitution**

117.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

118.    Article I, Section 8 of the New York Constitution preserves the right of every citizen to "freely speak, write and publish his or her sentiments on all subjects."

119.    Defendants through the foregoing actions violated Plaintiff's rights under Article I, Section 8 of the New York Constitution.

120.    As a direct and proximate result of the foregoing actions, Plaintiff suffered injuries and damages.

**SIXTH CAUSE OF ACTION**
**Against All Defendants**
**For Unreasonable Seizure in Violations of**
**Article I, Section 12 of the New York State Constitution**

121.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

122.    Article I, Section 12 of the New York Constitution holds inviolate the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."

123.    Defendants through the foregoing actions violated Plaintiff's rights under Article I, Section 12 of the New York Constitution.

124.    As a direct and proximate result of the foregoing actions, Plaintiff suffered injuries and damages and continues to suffer further injuries from the ongoing violation of his rights under Article I, Section 12 of the New York Constitution.

## SEVENTH CAUSE OF ACTION
### Against Defendants University of Rochester and John Doe Officers 1-6
### For Common Law False Imprisonment

125.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

126.    Defendants Doe Officers 1-6, acting within the scope and course of their duties as employees of Defendant University of Rochester, intentionally restrained Plaintiff without lawful basis and Plaintiff was aware and did not consent to this restraint.

127.    As a direct and proximate result of the foregoing conduct, Plaintiff suffered injuries, including the deprivation of his liberty, fear, and embarrassment.

## EIGHTH CAUSE OF ACTION
### Against All Defendants for Negligence

128.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

129.    Defendants Pickering and John Officer Does 1-6 owed Plaintiff a duty of care, including the duty to exercise due care in the course of their duties as employees of Defendant University of Rochester.

130.    Defendants Pickering and John Officer Does 1-6, by the foregoing acts, negligently failed to use due care in the performance of their duties in that they failed to perform

their duties with the degree of care that a reasonably prudent and careful university faculty or administrator would have used under similar circumstances.

131.    The acts of Defendants Pickering and John Officer Does 1-6 were performed without any negligence on the part of Plaintiff.

132.    As a direct and proximate result of the foregoing conduct, Plaintiff suffered injuries, including the deprivation of his liberty, fear, and embarrassment.

**WHEREFORE**, Plaintiff demands judgment jointly and severally against Defendants and prays for the following relief:

(A)    a declaratory judgment that Defendants may not, under the facts described above, ban Plaintiff from entering University property and threatening to arrest Plaintiff under these circumstances in the future is unlawful;

(B)    an injunction enjoining the University's present ban on Plaintiff entering University property;

(C)    full and fair compensatory damages in an amount to be determined by a jury;

(D)    punitive damages in an amount to be determined by a jury;

(E)    reasonable attorney's fees and the costs and disbursements of this action;

(F)    interest; and

(G)    such other and further relief as the Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: December 16, 2024

_____

Joshua S. Moskovitz
The Law Office of Joshua Moskovitz, P.C.
14 Wall Street, Suite 1603
New York, New York 10005
(212) 380-7040
Josh@MoskovitzLaw.com

/s/

_____

Donald M. Thompson
Easton Thompson Kasperek Shiffrin LLP
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
dmthompson@etksdefense.com

*Attorneys for Plaintiff Reynaldo DeGuzman*